UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 24-173(1) (ECT)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **GOVERNMENT'S POSITION** |
| v. | ) | **REGARDING SENTENCING** |
| | ) | |
| ABDIAZIZ SHAFII FARAH, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys, Daniel N. Rosen, United States Attorney for the District of Minnesota, and Matthew C. Murphy, Assistant United States Attorney, submits the following sentencing memorandum and respectfully requests that the Court impose a sentence of 135 months' imprisonment, the high-end of the guidelines range.

## THE OFFENSE CONDUCT

On April 22, 2024, jury selection began in the case of *United States v. Farah et al.*, 22-124 (NEB), in which the defendant and his brother, Said Farah, were defendants. Soon after the jury was selected, the defendant and his brother, together with other co-defendants in that case, decided to bribe the jury in exchange for a not-guilty verdict. The defendant quickly identified Juror 52 as the best candidate to bribe—believing her to be the youngest and only person of color on the jury—and began making plans to bribe her with

Said and another of his co-defendants, Abdimajid Nur. The three began researching Juror 52 online, including locating her home address. They also had the defendant's younger brother, Adbulkadir Farah, conduct surveillance of Juror 52 and of Juror 52's house, including identifying where Juror 52 parked her car during her jury service. The defendant concluded, as he stated to his codefendants: "that juror . . . we can get to her . . . I'm serious for real.

Soon thereafter, Abdimajid recruited a former girlfriend, Ladan Ali, to help plan and deliver the bribe. On May 30, 2024, Ladan flew from her home in Seattle, Washington, to Minneapolis, Minnesota, to execute the juror bribery scheme. Abdimajid provided Ladan a photo of Juror 52's car, which he told Ladan Juror 52 parked in the Jerry Haaf Memorial Parking Ramp every day during trial. On May 31, 2024, the first day of closing arguments, Ladan followed Juror 52 from the Haaf ramp to her home. Ladan continued to surveille Juror 52's home over the ensuing three days, and the defendant ordered a magnetic GPS tracker to be placed on Juror 52's car to make surveillance easier.

On June 2, 2024, the defendant sent an encrypted Signal message to Said, telling him to "have the money ready" by 10:00. He then instructed Said and Abdimajid to meet him at Said's business, Bushra Wholesalers, in South Minneapolis, where Said gave Abdimajid $200,000 in cash. Abdimajid took the money to a parking lot in Bloomington, where he transferred it to Ladan.

2

Abdimajid instructed Ladan to go to a gas station near Juror 52's house, where she would rendezvous with Abdulkadir.

Because the defendant and Said did not trust Ladan, they instructed their younger brother, Abdulkadir, to meet Ladan at the gas station. He was told to drive her in her rental car to Juror 52's home to deliver the bribe payment, and to record the exchange. Ladan and Abdulkadir met at the gas station later that evening as instructed. Abdulkadir first drove Ladan to a Target store where he purchased a screwdriver and removed the license plate from Ladan's rental car. He then drove Ladan to Juror 52's house. While Ladan walked the bribery payment to Juror 52's front door, Abdulkadir took a video with his cell phone. The video shows Ladan approach the front door and hand a bag containing the bribery payment to Juror 52's stepfather, telling him it was a "present" for Juror 52 and that there would be more if she voted not guilty. Abdulkadir sent the video via the Signal encrypted messaging app to the defendant as proof that the bribe was delivered. The defendant forwarded the video to Said, with the message "watch and delete." He texted another coconspirator that he had "a good feeling [Juror 52] will come through and that's a lot of money for her family."

To her credit, Juror 52 immediately reported the bribery attempt to the police. The next morning, prosecutors reported the bribe to the Court, and the Court ordered the defendant immediately to surrender his phone to law

enforcement. Before law enforcement officers could confiscate his phone, however, the defendant conducted a factory reset to delete the messages, video, and other evidence of the bribe. The jury returned its verdict on June 7, 2024, convicting the defendant on various counts. He was sentenced to 336 months imprisonment on August 6, 2025.

On June 25, 2024, a federal grand jury indicted the defendant with one count of conspiracy to bribe a juror, one count of bribing a juror, one count of corruptly influencing a juror, and one count of obstruction of justice. One year later, on June 18, 2025, the defendant pleaded guilty to one count of bribing a juror.

## SENTENCING RECOMMENDATION

In *Gall v. United States*, the Supreme Court set forth the appropriate sentencing methodology. 552 U.S. 38, 49–50 (2007). The district court should first calculate the advisory Sentencing Guidelines range. *Id.* at 49. After calculating a defendant's advisory Sentencing Guidelines range and hearing from the parties, the district court must then consider the sentencing factors set forth in 18 U.S.C. § 3553(a) and make an individualized assessment based on the facts in arriving at an appropriate sentence. *Id.* at 49–50; *see also United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally

4

decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors.").

## A.    Sentencing Guidelines Range

The government has no objections to the Guidelines calculation contained in the presentence report ("PSR"). Accordingly, the government agrees that the base offense level is 12, pursuant to U.S.S.G. § 2C1.1(a)(2). The government agrees that the offense level should be increased by 10-levels pursuant to U.S.S.G. §§ 2C1.1(b)(2) and 2B1.1(b)(1)(F) because the value of the bribe was more than $150,000 but less than $200,000, by another 4-levels pursuant to U.S.S.G. § 2C1.1(b)(3) because a juror is a public official, and by another 2-levels because the defendant attempted to obstruct and impede the administration of justice with respect to the investigation of the instant offense, pursuant to U.S.S.G. § 3C1.1. The government further agrees that a 2-level increase applies because the defendant was an organizer, leader, manager, or supervisor of the bribery scheme. U.S.S.G. § 3B1.1(c). The government agrees that the offense level should be reduced by 3-levels for acceptance of responsibility, pursuant to U.S.S.G. § § 3E1.1(a)-(b). Finally, the government agrees that the defendant falls into criminal history category II.

With a total offense level of 30 and a criminal history category II, the sentencing Guidelines range is 108-135 months' imprisonment

**B.     Section 3553(a) Sentencing Factors**

Section 3553(a) requires the Court to analyze several factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a).

**1.     Nature and Circumstances of the Offense**

Mr. Farah committed a profoundly serious crime that merits an equally serious sentence. Tampering with juries, whether by bribery or intimidation, compromises our entire legal system. It undermines public trust in the fairness of criminal trials by corrupting the bedrock principle that an impartial jury will render its verdict based solely on the facts presented at trial. It is not hyperbolic to say that without trust that our criminal courts will deliver justice fairly, the vitality of our democracy is threatened.

**2.     History and Characteristics of the Defendant**

Mr. Farah was born in Somalia in 1988. His mother was killed during the Somalian civil war when he was just 2 years old. Shortly after, his father took Mr. Farah and his siblings to a refugee camp in Kenya, where he lived for the next 14 years. In 2006, Mr. Farah immigrated to the United States, settling

6

in Minneapolis. Mr. Farah excelled in school, graduating high school in 2007, and obtained a full scholarship to the University of Minnesota.

After graduating from the University of Minnesota in 2010 and obtaining a business administration degree from Metropolitan State University in 2011, Mr. Farah worked for the Metropolitan Council. After he was fired for attendance issues, he opened Empire Gas and Grocery in Shakopee, Minnesota, which catered to East Africans working at the Amazon and Shutterfly warehouses there. He later used the business to gain entry into the Feeding Our Future fraud scheme. In addition to the gas station, Mr. Farah opened a childcare business, a home care business, and a charter school.

The defendant was convicted in June 2024 for defrauding the Federal Child Nutrition Program of $47 million—money intended to provide meals to needy children during the COVID-19 pandemic. He was convicted by the same jury he brazenly tried to corrupt by bribing one of its members.

Mr. Farah's involvement in the underlying Feeding Our Future fraud scheme included paying bribes and kickbacks to employees of Feeding Our Future and Partners in Nutrition in exchange for their sponsorship of his fraudulent meal distribution sites. He then used those sham sites to submit fraudulent meal reimbursement claims, alleging that he served meals to multiple millions of needy children each month. Mr. Farah used the more than $8 million taxpayer dollars he personally pocketed from the fraud scheme to

fund a lavish lifestyle, including purchasing a Porsche and several other expensive vehicles, domestic and foreign real estate, luxury travel, and other personal expenses. Following his indictment, Mr. Farah fraudulently obtained a passport and attempted to flee the country. He was sentenced in August 2025 to 336 months imprisonment.

Mr. Farah is married and has four minor children. He is in good physical and mental health.

### 3. Deterrence, Respect for the Law, and Protecting the Public

Mr. Farah's conduct is so abhorrent and destabilizing that the Court should send a strong message to the community that such behavior simply will not be tolerated. Others who might consider bribing a juror must know that doing so will result in devastating consequences. Nothing less than a sentence at the high-end of the guidelines range will suffice to send the message that justice is not, and never will be for sale, and that the Court will levy maximum sentences upon those who jeopardize the integrity of our judicial system.

### 4. The Need to Avoid Unwanted Disparities

Finally, the Court must consider the need to avoid unwarranted disparities. 18 U.S.C. § 3553(a). As noted in the PSR, there was an insufficient number of defendants sentenced within the past four years under the same guideline provision and with the same offense level and criminal history as Mr. Farah for the Probation Officer to conduct a statistical analysis of sentencing

data. That is because the bribery scheme perpetrated by Mr. Farah is so unprecedented and brazen that there simply are no defendants whose offense conduct is analogous.

Mr. Farah's younger brother, who was a minor participant in the conspiracy Mr. Farah orchestrated to bribe Juror 52 (and who had a total adjusted offense level of 23 and a criminal history Category I), was recently sentenced by the Court to 57 months, the high end of his guideline range. It is right, therefore, that Mr. Farah, who was the organizer and leader of the bribery scheme, also receive a top of the guidelines sentence.

## CONCLUSION

For the reasons stated above, the government respectfully recommends that the Court sentence Mr. Farah to 135 months' imprisonment. Such a sentence is sufficient but not greater than necessary to meet Section 3553(a) factors.

Respectfully Submitted,

Dated: July 3, 2026,

DANIEL N. ROSEN
United States Attorney

/s/ *Matthew C. Murphy*
BY:   MATTHEW C. MURPHY
Assistant U.S. Attorney