UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | DEFENDANT'S POSITION REGARDING |
| | ) | SENTENCING |
| vs. | ) | |
| | ) | |
| Abdiaziz Shafii Farah, | ) | Crim. No. 24-173 (ECT/DLM) |
| | ) | |
| Defendant. | ) | |

Defendant Abdiaziz Shafii Farah, through his counsel subscribed, respectfully submits this Position Regarding Sentencing pursuant to Local Rule 83.10(e).

Congress has directed sentencing courts "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). With that mandate in mind, this position pleading summarizes a couple of Defendant's continuing objections to the presentence investigation report, it discusses important considerations regarding the history and characteristics of Defendant Farah, and it specifically recommends a total sentence of imprisonment of 78 months to be served concurrently with the sentence in case number 22-124 (NEB/DTS) – except for a portion (eight months) that is required to be run consecutively pursuant to 18 U.S.C. § 3147, as implemented by §3Cl.3 of the United States Sentencing Guidelines Manual.

1

CONTINUED OBJECTIONS TO THE PRESENTENCE REPORT

Para. 44: Mr. Farah continues to object to the offense narrative regarding this relevant-conduct conviction for the same reasons and regarding the same facts as in the previous related presentence investigation. Specifically, he objects to the factual assertions in the following sentences as false and unsupported:

> Farah was an organizer or leader in a scheme to defraud the Federal Child Nutrition Program (FCNP)
> . . . .
> Farah and other coconspirators then continued submitting fraudulent claims through non-profit organizations, many of which were shell entities, and provided fictitious meal counts, child rosters, and expenditure invoices in support of the false claims for FCNP reimbursements.
> . . . .
> Farah and his coconspirators received more than $47,000,000 in FCNP funds over an 18-month period, including over $30,000,000 received by Empire Cuisine & Market and over $8,000,000 received directly by Farah.

Para. 45: As noted in this paragraph and discussed during the PSR interview, Mr. Farah believes most of these alleged infractions involved someone other than himself.

OFFENSE CONDUCT

The conduct underlying the offense of conviction in this case was an attempted bribery of a sitting juror in the related "Feeding our Future" fraud trial, at which Defendant Farah was convicted and subsequently sentenced to 28 years in prison. The defendants carried out the attempted bribery by delivering a gift bag with

$120,000 to the juror's home and leaving it with a family member with the message that there would be more if the juror voted for an acquittal. The Minnesota juror chose instead to call the police.

ADDITIONAL SENTENCING CONSIDERATIONS

1.      Sentencing Guidelines Considerations.

Defendant Farah does not quarrel with how the guidelines were technically calculated, but he does note that the calculation in this case has resulted in an inflated advisory sentencing range from which the Court should vary downward, as explained below.

First, when a jury tampering or another obstructive conduct charge arises from offense conduct during the investigation or trial of another offense that results in a conviction, the sentencings for the obstructive conduct conviction and the underlying offense conviction are usually consolidated. *See, e.g., United States v. Williams*, 935 F.2d 1531 (8th Cir. 1991); *United States v. Hankins*, 931 F.2d 1256, (8th Cir. 1991). The related cases under consideration here, however, were not consolidated for sentencing and the resulting guidelines calculations for the instant case produce an unfairly distended advisory sentencing range by virtue of small, but meaningful, increases on both axes of the guidelines.

On the first axis, three levels have been added for having committed the instant offense while on pretrial release during the trial for the underlying fraud offense (pursuant to §3Cl.3), but the criminal history category *also* has been increased by adding on criminal history points for the underlying fraud conviction. In a consolidated sentencing, of course, this double-

whammy would never have occurred because Mr. Farah had no criminal history at all when he committed *both* of the related pair of offenses, and his criminal history category would have remained at I when the Court imposed a unitary sentence. Both Parties had assumed during plea negotiations that there would be a consolidated sentencing for these related offenses, which is why they both believed "that, at the time of sentencing, the defendant will fall into Criminal History Category I." Plea Agreement [R. Doc. 163], at 7. Defendant asks the Court to vary from the calculated guidelines range to account for that reasonable understanding by the Parties.

Another wrinkle in the sentencing guidelines calculation is merely a product of timing. When the Parties negotiated the plea, they were not aware that the Sentencing Guidelines Commission was going to "consider whether the loss table in §2B1.1 should be revised to . . . to adjust for inflation." The Commission published its Notice of Final Priorities for the 2025-2026 amendment cycle two months after the change-of-plea hearing in this case. *See* U.S. Sent'g Comm'n, "Notice of Final Priorities," 90 Fed. Reg. 39263 (Aug. 14, 2025). It thereafter did in fact adopt a proposed amendment to the loss table in § 2B1.1 to account for inflation. The last time it had done so was in 2015. Absent Congression action, the new loss table takes effect on 1 November 2026.

In this case, the attempted bribery consisted in the delivery of a gift bag containing $120,000 to the juror's family. P.S.R., at para. 16. Even if we use the "intended" amount of $200,000 (*see* P.S.R., at para. 15), the specific offense characteristic based on the revised

§2B1.1 loss table would require the addition of only 8 levels to the base offense level, resulting in a final adjusted offense level of 31 (instead of 33 as calculated with the outgoing loss table). After subtraction of three more levels for acceptance, the final offense level would be 28. And when an offense level of 28 is paired with a criminal history category of I, the advisory range of imprisonment is 78 to 97 months. While the use of the revised guidelines does not become mandatory for another three and half months, the justification for the revision supports a variance by the Court's to apply the revised guideline now.[1]

2. Background and Characteristics of the Defendant.

The presentence report sets forth the basic information related to Mr. Farah's displacement due to the Somali Civil War, which need not be repeated here. But the Court would benefit from additional details concerning Mr. Farah's background.

A. Early Exposure to Violence & Suffering

Before moving to the Utange Refugee Camp in Kenya, all Mr. Farah remembers about his early life is chaos. As a young child, "the destruction was all right in front of me. The explosions, violence, death." He saw people shot and recalls the desperation of people hiding in places that were unimaginable. He still has vivid memories of "the sounds of distress – people asking for help, the wailing, gasping for their last breath." When the war broke out, there were killings, property

---

[1] In the alternative, Defendant would seek to continue the scheduled sentencing until November.

destruction that targeted resources (schools, food and water systems), and forced migration of entire communities.

When Mr. Farah's mother was killed in a violent bombing in his village, he was not provided with any explanation for her sudden absence. There was no time to talk about what had happened. Mr. Farah did not really understand that his mother was dead until he was fifteen years old.

When he arrived at Utange, the camp was so overcrowded that Mr. Farah and his family had to live in tents outside of the refugee camp for two years. This waiting area was just a series of large canvas tents where people would sleep on thin mats. The waiting area had even more issues with cleanliness and limited resources than the refugee camp itself. Even when they finally were permitted to move inside, Mr. Farah and his family encountered very dire conditions, including severe illness and starvation. The hardest part was that there was no food. One was lucky to get one meal a day. They were sleeping on mats.

There was also a great deal of violence, drug abuse, and people just dealing with all kinds of sickness. There was a great deal of mental, emotional, and physical suffering. There were no elements of a normal childhood in the camp. People were desperate and Mr. Farah witnessed and personally experienced physical and psychological abuse from the people who ran the camp.

Mr. Farah's parents were part of the Hawiye Clan, a minority clan in Somalia. The same clannish hierarchy from outside existed inside the refugee camps, and it was "the law of the jungle where the strongest survive." Corruption was endemic. While in Utange, Mr. Farah witnessed shootings, lynchings, gender violence, and fights for resources like food, water, and shelter. The overwhelming disregard for human life is something he is still processing in adult life. He still experiences vivid memories of the impact of starvation, drug abuse, and people dying from illnesses like dysentery, cholera, and malaria. He remembers mass graves adjacent to the camp. There was constant flooding of the camps that made contamination issues worse. The camp was in a mountainous region, and when it rained it would pull red sand down from the mountain. People were carried away by the flood waters. The frequent flooding also created issues with mold in the various camp facilities.

When Mr. Farah's father left Utange to seek asylum in the United States, Mr. Farah was six years old. He did not see his father again for almost a decade. Two of his older siblings became his caregivers when his father left. They were only sixteen at the time. Without his father present, there was nobody to shield him from the negative elements in the refugee camp. He was put in a position of survival on a day-by-day basis. His would be playing soccer with someone his age

one day, only to learn the next day that his friend was gone. He was very aware that the same could happen to him.

There was a United Nations school that opened during Mr. Farah's early years at Utange. It was about a 30-minute walk from the camp. A religious leader encouraged him to attend, and he was able to learn basic math, reading, and writing. He spent 4 hours-a-day, 4 days-a-week in school. He hoped to learn English and better his life. He was the only one of his nine siblings who was able to attend. Attendance was determined by clan base and whom you knew. He continued to experience a lot of bullying in school because of his minority clan status. He was one of maybe 4 people from his clan among a student body of close to 1000. He was frequently beaten by the other students. Occasionally, an adult teacher joined in and hit him with a stick. There was a lot of physical punishment in the school setting for issues like being late or poor performance. Mr. Farah knows that he is very lucky to be here at all.

In retrospect, Mr. Farah realizes that his offense conduct underlying the instant offense of conviction arises directly from his experience in Utange. The bribery plan was obviously an illegal and foolish grab for an escape in the face of impending catastrophe. Despite Defendant Farah's great success in rising above what he had experienced at Utange, he let the anxiety, stress, and heavy emotions of an impending return to another prison environment push him back to the

survival tactics he had learned in a refugee camp – where the system was literally built on bribery and other forms of corruption.

### B.    Transition to the United States

As noted in the PSR, Mr. Farah was very dedicated to educational advancement upon his entry to the United States. He spent his nights with a dictionary trying to catch up. He always wanted to catch up and do something different. Outside of school, his transition to the U.S. was much more difficult, both culturally and physically. His father worked 12-18 hour days, so the two did not have time to re-build the father-son relationship that had been severed over a decade prior. In addition to his demanding school schedule, Mr. Farah worked part-time jobs to help his dad pay the bills. He was constantly worried about where his next meal would come from after so many years of being hungry. He experienced extended periods of loneliness and depression, and always felt like he had to do extra. At times he was the target of discrimination both at school and in his new community in South Minneapolis.

### C.    Current Family Situation

Although information related to Mr. Farah's wife and children is included in the presentence report at paragraphs 60-61, it is appropriate to provide more details regarding his son, A.S., who has special needs. Ms. Dubat was pregnant with A.S. when the police first showed up at the family house to investigate the fraud case.

The investigation was very stressful for her pregnancy and she attributes a lot of her son's issues now to the depression and stress she felt during her pregnancy.

In May 2026, A.S. was diagnosed with speech or language delay and developmental delay in the primary care setting. Mr. Farah's wife is currently working with care coordinators through their pediatric clinic to schedule an autism evaluation with the hope of establishing ABA (Applied Behavioral Analysis, a type of therapy for children with autism).

In addition, A.S. was evaluated by Early Intervention Services through Prior Lake-Savage Area Schools in March 2026 after completing the Minneapolis Preschool Screening. A.S. qualified for an Individualized Education Plan which indicates that,

> [A.S.] is demonstrating a significant delay in the area of cognitive skills. These delays impact his ability to participate in preschool activities independently and show others what he knows . . . receptive and expressive language delays impact his ability to follow directions, communicate his wants and needs and engage in adult and peer interactions in the preschool classroom.

Specifically, providers noted that A.S. does not respond to his name, cannot follow one-step directions, cannot count or identify colors, is not potty trained, and does not speak. He displayed significantly delayed fine motor skills as well as delays in social/emotional skills. He was referred for early childhood special education, occupational therapy, and speech therapy through the school district.

Given Mr. Farah's incarceration, his wife has been left to navigate this difficult process of caring for a child with special needs on her own. Prior to his incarceration, Mr. Farah was a very involved father – he assisted with pick up, drop off, basic care, taking his kids to the arcade, helping with homework, and taking his kids to playdates. As noted by his wife, most men in the Somali culture do not have that kind of connection with their children. Losing Mr. Farah to incarceration has really been hard on her.

Indeed, the physical disconnection from his family has been hard on everybody. Mr. Farah has tried to do video visits as much as possible, but it can be hard to get on the schedule. One of his struggles arises from guilt and remorse about the impact his choices have had on his children. Mr. Farah didn't have a two-parent household himself growing up, and he had promised himself that he was going to give that to his children. His failure to fulfill that promise weighs heavily.

D.   Custodial Adjustment.

Mr. Farah has worked as a trustee at the Sherburne County Jail since September 2024. He assists with the delivery of the food carts to various units, maintains floors and windows throughout the facility, cleans the booking area, gives support to laundry services, delivers kites throughout the jail, cleans gyms, and performs other maintenance like painting and waxing. Prior to becoming a trustee, he was a

pod worker for 12-13 months[2] and was responsible for day-to-day cleaning of his unit, helping with food delivery, transporting clients in wheelchairs to the clinic, and being a leader on the unit. In addition to his formal duties, Mr. Farah uses his language skills (he is fluent in Arabic, Somali, and English) to help some of the COs communicate with other inmates. When he was on the unit, he also helped people study for their GED and he helped lead a religious service.

While in custody in Sherburne County, Mr. Farah has taken full advantage of the mental health services available to him. He has completed numerous therapeutic groups including Cognitive Behavioral Therapy (8 weeks), Grief and Loss (10 weeks), Life Skills (6 weeks), Mini Dialectical Behavioral Therapy (10 weeks), Psychoeducation (6 weeks), and Trauma-Informed (8 weeks). Each of these groups is facilitated by licensed and board-certified clinical mental health therapists. Clients participating in the group programming are assessed, and their progress is monitored, through documentation such as treatment plans, weekly homework, and overall attendance.

In addition, Mr. Farah has participated in individual therapy on a bi-weekly basis since May 2025. He was formally diagnosed with Post-Traumatic Stress

---

[2] Page F.2 of the current presentence report does not provide a complete account of his pretrial incarceration. It is accurately set forth in the presentence report from the related fraud case on page F.2: He was arrested on a federal bench warrant and detained at the Sherburne County jail on 5/23/2022, released on conditions on 20 December 2022, and taken into custody again on 3 June 2024, where he remains.

Disorder (PTSD) related to his early life experiences in refugee camps. During sessions, Mr. Farah identified that being in jail brings back a lot of memories of being in the refugee camps. When he was in the community, Mr. Farah explained that he always had the goal of ignoring the past and moving forward. Where he is now, the past is always coming back. The lockdowns, the punishment, the absence of loved ones, lack of self-control, disrespect, the rude awakenings, being told what to do and how to do it. It all brings back memories of his past. The stigma around mental health treatment in the Somali culture had made it difficult for him to get the support he needed before his arrest. The treatment notes from jail list over 15 specific PTSD symptoms that Mr. Farah and his therapists have identified.

Mr. Farah now acknowledges that a lot his decision-making process has been impacted by his past, and that he never would have understood that before sitting across from a therapist. His participation in services has allowed him to overcome the stigma he held about mental health and has allowed him better to understand other people's experiences. He believes he is now much less judgmental of others and has learned acceptance of people who have different values and lifestyles. He also notes that he is better equipped to parent.

In addition to therapeutic groups offered at the jail, Mr. Farah has taken many tablet-based courses focused on business ethics and has worked to relate the information from his own offense behavior. He also has taken health and wellness

courses and reads books about philosophy and spirituality. He participates in physical education (playing basketball and volleyball) and aims to exercise for 45-60 minutes a day. Mr. Farah also is a devout Muslim, spending a lot of time praying and practicing his faith. Finally, he spends as much time as possible talking to his kids – helping them with schoolwork, and working on language development with his son.

Throughout his stay as an inmate at the Sherburne County jail, Mr. Farah has remained dedicated to personal improvement. His life priorities have changed. His goals are now self-improvement and to be there for his family. He intends to continue along that path during his time in BOP, and when he is released. While in the BOP, Mr. Farah is interested in pursuing a master's degree in the technology industry. After his release, he wants to give back to the community. He intends to engage in volunteer work and has expressed interest in becoming a volunteer firefighter. More than anything, he wants to be a better parent and a role model for kids and a better husband to his wife.

SENTENCING RECOMMENDATION

As the presentence report explains in paragraph 89, "[a] *portion* of the term of imprisonment must be imposed consecutively to the sentence imposed in Docket No. 0:22CR00124, pursuant to 18 U.S.C. § 3147." Congress delegated the mechanism for implementing § 3147 to the Sentencing Commission, which has done so through its

14

adoption of U.S.S.G. §3Cl.3.[3] Section 3C1.3 instructs sentencing courts that "to comply with the statute," they "should divide the sentence on the judgment form between the sentence attributable to the underlying offense and the sentence attributable to the enhancement." §3C1.3, comment., note 1. In this case, therefore, the Court must first determine the total appropriate sentence after consideration of the guidelines. As noted above, Defendant respectfully suggests that the Court adopt a small downward variance to a guideline range of 78 to 97 months, and then choose a total appropriate sentence (from the bottom of that range) of 78 months imprisonment. The Court must then split the sentence into the portion attributable to the bribery conviction and the sentence attributable to the enhancement. As the examples in the application note illustrate, this can reasonably be accomplished in this case by imposing a sentence of 70 months on the underlying offense of bribery, and 8 months for the §3147 enhancement. That would require that 8 months of the instant sentence be imposed to run consecutively to the sentence imposed in the related fraud case.

The portion of the sentence that is attributable to the bribery conviction should, of course, be imposed to run concurrently to the undischarged term of imprisonment arising from the related fraud conviction, as required by §5G1.3(b). That section also requires that the Court first "adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment," but as a practical matter,

---

[3] After an initial implementation through §2J1.7.

that may not make any difference considering the remaining length of the undischarged term of imprisonment. Good discretion nonetheless counsels in favor of following the recommendations of §5G1.3 in full since the undischarged term of imprisonment is still subject to appellate review and collateral attack. Mr. Farah already has been in custody for more than two and a half years[4] in the "hard-time" conditions of a county jail, but all of that time will have been credited against the sentence imposed for the fraud conviction – and therefore the BOP will *not* credit it against whatever sentence the Court imposes for the instant conviction.

The suggested sentence is certainly sufficient to achieve all of the statutory purposes of sentencing in this case.

Dated: 5 July 2026

Respectfully submitted,

GERDTS LAW PLLC

*s/ Daniel L. Gerdts*

_____
Daniel L. Gerdts (#207329)
331 Second Avenue South, Suite 705
Minneapolis, MN 55401
612-800-5086
daniel@danielgerdtslaw.com

---

[4] From 5/23/2022 until 12/20/2022, and again from 6/3/2024 to the present.